[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15556
_____

D.C. Docket No. 2:12-cv-00042-WKW-CSC

JILL STEIN,
ALABAMA GREEN PARTY,
ROBERT COLLINS,
CONSTITUTION PARTY OF ALABAMA,
JOSHUA CASSITY,
STEVEN KNEUSSLE,
LIBERTARIAN PARTY OF ALABAMA,
MARK BODENHAUSEN,
VICKI KIRKLAND,
GARY JOHNSON,
Governor, the presidential nominee of the Libertarian
Party,

Plaintiffs - Appellants,

MATTHEW HELLINGER,

Plaintiff,

versus

ALABAMA SECRETARY OF STATE,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(December 16, 2014)

Before HULL, MARCUS, and DUBINA, Circuit Judges.

PER CURIAM:

In this ballot access case, we consider whether the district court erred in granting summary judgment to the Alabama Secretary of State on the Plaintiffs' claim, pursuant to 42 U.S.C. § 1983, that Alabama's ballot access statute violates their First and Fourteenth Amendment rights. After reviewing the record and having the benefit of oral argument, we affirm the district court's judgment.

## I.  BACKGROUND

Alabama law provides that political parties must qualify to appear on the general election ballot, and they may do so by either performance or petition. The performance option grants statewide ballot access to parties that received at least twenty percent of the votes cast for any state officer in the last general election. Ala. Code § 17-13-40. This is how the Republican and Democratic Parties, for example, obtain ballot access.

For parties that do not qualify based on performance, the petition option is available. To qualify by this method, parties must submit the signatures of

2

registered voters totaling at least three percent of the votes cast for the governor in the last general election, and they must do so by the date of the first primary for the general election. *Id.* § 17-6-22(a). The primary election date in presidential-election years is March; otherwise, the deadline is in June. *See id.* § 17-13-3.

In January 2012, the Plaintiffs[1] filed suit against the Alabama Secretary of State, alleging that the State's ballot-access laws were unconstitutional, both facially and as applied, with respect to presidential candidates.[2] The record reveals that the Plaintiffs filed suit despite having made no significant effort to secure the number of signatures needed to qualify for ballot access by petition.[3] The Plaintiffs later filed an amended complaint, focusing their allegations on Alabama's disparate ballot-access requirements for political parties and independents that seek to qualify by petition. The parties filed cross-motions for summary judgment, and on September 5, 2013, the district court granted the State's motion and denied the Plaintiffs' motion. Plaintiffs timely moved for

---

[1] The Plaintiffs are three political parties that did not qualify for ballot access in the State's general election under § 17-13-40—Alabama Green Party, Constitution Party of Alabama, and Libertarian Party of Alabama—as well as seven individuals—Jill Stein, Robert Collins, Joshua Cassity, Steven Kneussle, Mark Bodenhausen, Vicki Kirkland, and Gary Johnson—who were either a party nominee for the Office of the President of the United States or a citizen interested in voting for such a nominee in the State's 2012 general election.

[2] In their initial complaint, the Plaintiffs sought injunctive relief. The district court denied their request, and the Plaintiffs did not appeal that order.

[3] For the 2012 general election, political parties seeking ballot access had until early March to submit their petitions containing the signatures of 44,828 registered voters (three percent of the 1,494,273 votes cast for governor in the 2010 general election).

reconsideration pursuant to Federal Rule of Civil Procedure 59(e), and the district court denied the motion.  Plaintiffs timely appealed.

## II.  STANDARD OF REVIEW

"This Court reviews a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court."  *Seff v. Broward Cnty., Fla.*, 691 F.3d 1221, 1222–23 (11th Cir. 2012) (internal quotation marks omitted).

## III.  DISCUSSION

We conclude that the district court properly granted summary judgment to the Alabama Secretary of State, and we adopt much of the district court's reasoning contained in its memorandum opinion and order.  However, we add to its thorough analysis that neither the Supreme Court nor this court has articulated a clear standard of review for challenges to ballot-access restrictions in a presidential election.  We note that nothing in this opinion does so.  At the same time, we recognize that "the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries."  *Anderson v. Celebrezze*, 460 U.S. 780, 795, 103 S. Ct. 1564, 1573 (1983).

Regardless, based on the record in this case, we hold that the Plaintiffs' constitutional claims fail.  Like the district court, we conclude that the Plaintiffs

did not present evidence showing that the legitimate, nondiscriminatory reasons for the State's restrictions on petition-based ballot access unconstitutionally burdens their associational rights.  Rather, the record shows that the burden on the Plaintiffs was slight.  Thus, the State's interests in treating all political parties fairly and in setting a deadline that provides sufficient time to verify the petition signatures outweigh the burden to the Plaintiffs' associational rights.

Accordingly, for these reasons and for the reasons stated in the district court's well-reasoned memorandum opinion and order filed on September 5, 2013, which we adopt and attach hereto as an appendix, we affirm the grant of summary judgment to the Alabama Secretary of State.

AFFIRMED.

"APPENDIX"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JILL STEIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-42-WKW |
| | ) | [WO] |
| JIM BENNETT, | ) | |
| Alabama Secretary of State, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Though the Alabama Green Party, the Constitution Party of Alabama, and the Libertarian Party of Alabama (collectively the "Party Plaintiffs") all fielded candidates for the 2012 presidential election, none of those parties' names appeared on Alabama's ballots. Instead, their candidates (including Plaintiffs Jill Stein and Gary Johnson (collectively the "Candidate Plaintiffs")) were listed on the ballot as independents. Along with four Alabama voters and one Florida voter (the "Voter Plaintiffs"), the Candidate Plaintiffs and the Party Plaintiffs sued the Alabama Secretary of State, to challenge the Alabama law they say kept the Party Plaintiffs' names off the ballot.

The matter comes before the court on cross motions for summary judgment. For the reasons that follow, the Secretary's motion is due to be granted and Plaintiffs' denied.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is proper under 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested.

## II. STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable factfinder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). If the movant meets its evidentiary

2

burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Id.* at 324.

## III. FACTUAL AND PROCEDURAL BACKGROUND

Party Plaintiffs Alabama Green Party, Constitutional Party of Alabama, and Libertarian Party of Alabama are unqualified political parties (as defined by Ala. Code § 17-13-40) that sought to have the nominees of their respective parties placed on the 2012 Alabama General Election ballot for the office of President of the United States. Voter Plaintiffs Robert Collins, Joshua Cassity, Steven Kneussle, and Mark Bodenhausen are members, officers, and supporters of Plaintiff Political Parties and Alabama residents who wished to vote for and support their chosen candidates for president at the 2012 Alabama General Election. Voter Plaintiff Vicki Kirkland is a United States citizen and Florida resident and voter who wished to support and vote for the candidate of her political party, the Libertarian Party, the Alabama affiliate of which is a Party Plaintiff. Candidate Plaintiffs Jill Stein and Gary Johnson were presidential candidates of unqualified political parties who wished to appear on the Alabama General Election ballot as nominees of the Green Party and Libertarian Party, respectively. Defendant Jim Bennett is being sued in his official capacity as

Secretary of State for the State of Alabama and Chief Elections Official for Alabama under Ala. Code § 17-1-3(a).

Alabama law distinguishes between candidates of parties who wish to appear on the ballot with their party identification and candidates who appear as independents with no party identification. For a candidate who wishes to appear on the ballot without party identification as an independent, all that is required is filing a petition with 5,000 signatures by September before the election. Ala. Code § 17-14-31(a). The requirements for a candidate to appear with printed party identification on the General Election ballot (essentially, for the party label to appear alongside the name of a candidate on the ballot) are significantly heightened. State laws place qualification requirements on the parties, not on the candidates themselves.

A party may qualify and appear with a label on the General Election ballot by either (1) performance or (2) petition. In the case of performance, a party may qualify if it achieved at least 20% of the entire vote actually cast for a state officer in the prior General Election. Ala. Code § 17-13-40. This qualification is only good for the next election, so a party must continually get 20% of the vote for at least one state officer on the ballot in order to qualify under § 17-13-40 for the next cycle.[1]

---

[1] This is how the Democratic and Republican parties earned their places on the 2012 General Election ballots.

4

If a party does not secure 20% of the vote for a state official in the previous election, it must file a petition by the date of the first primary election for the next election, with the signatures of at least 3% of the qualified voters who cast a ballot for governor in the last general election. Ala. Code § 17-6-22(a)(1). Because none of the Party Plaintiffs' candidates achieved 20% of the vote in 2010, they could only obtain placement on Alabama's 2012 ballot by gathering 44,828 signatures from registered voters and submitting them to the Secretary by March 13, 2012.[2] None of the Party Plaintiffs thought they could manage to get that many signatures in time, so they did not try.[3]

Nevertheless, Candidate Plaintiffs Stein and Johnson's names appeared on the General Election ballot in November 2012 because each gathered 5,000 signatures

---

[2] In previous election cycles where the first primary was held in June, unrecognized political parties essentially had an additional three months to gather signatures, because the deadline was tied to the date of the primary election. Alabama previously held two general election primaries, one for presidential primaries in February and primaries for all other offices in June. Under the old system, third parties could file their petitions by the date of either primary, giving them an effective deadline of June before the November election. In 2011, Alabama consolidated these two primaries into one, to be held in March of presidential election years, and in June of off-years/midterms. The purpose was to save money by avoiding multiple primaries. As a result of the March deadline adopted in 2011, an unrecognized party must now submit its petition eight months ahead of a General Election.

[3] The last time one of the Party Plaintiffs tried to get on the ballot was 2008, when the Constitution Party's current chairman took it upon himself to collect the signatures necessary (then 37,513 signatures (Doc. # 96-1 ¶ 24)) to get his party on the ballot. That initiative ended abruptly after the chairman collected approximately five (5) signatures in his neighborhood and decided to lower his sights to the more attainable target of helping his party's candidate qualify as an independent. (Doc. # 100 at 7–8.)

5

prior to September.  But because their parties failed to meet the more onerous March signature deadline, Stein and Johnson did not bear their parties' names on Alabama's ballots.   Instead, Stein and Johnson appeared as independents.[4]   According to Plaintiffs, Alabama's ballot access laws discriminate against presidential candidates of unrecognized parties, like Stein and Johnson, by imposing an early March deadline to appear on the ballot with their party label, while permitting independent presidential candidates to meet the less onerous September deadline to appear on the ballot.

Plaintiffs asked the court for a preliminary injunction that would have allowed the Party Plaintiffs to put their names on the ballot without having to submit a ballot-access petition.  The court denied the preliminary injunction because Plaintiffs "failed to provide an evidentiary basis to conclude" Alabama's election law imposed an unconstitutional burden on them.  (Doc. # 64 at 19.)  Plaintiffs' Amended Complaint requests that this court enter a judgment declaring that Alabama Code §§ 17-14-32, 17-6-22, and 17-13-40 are unconstitutional, both facially and as applied to Plaintiffs, in violation of the First and Fourteenth Amendments.  (Doc. # 77 at 6.)

---

[4] No third party candidate has appeared on the presidential ballot with party identification in Alabama since Harry Browne.  In 2000, Browne bore the Libertarian Party label because his party filed a petition with 39,535 signatures.  The Libertarian Party also secured party identification using the 20% rule in 2000, for the 2002 election cycle, by votes for a state supreme court justice.  In 1996, two parties achieved label status in Alabama: the Libertarian and Natural Law parties.  The Libertarian Party did so through the petition system, but under the old 1% rule, which was changed in 1995.

As the following discussion will show, Plaintiffs' case for declaratory relief fails.

## IV. DISCUSSION

First Amendment challenges to state election laws are governed by *Anderson v. Celebrezze*, 460 U.S. 780 (1983). Under *Anderson*, a reviewing court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." 460 U.S. at 789. Then the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* Finally, the court must "determine the legitimacy and strength of each of those interests," while also considering "the extent to which those interests make it necessary to burden the Plaintiff's rights." *Id.*

Further, if the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). But when a state's election law imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (quotations omitted). In short, the level of the scrutiny to which election laws are subject varies with the burden they

7

impose on constitutionally protected rights – "Lesser burdens trigger less exacting review." *Id.*

**A.**    **Plaintiffs have not demonstrated a burden that would subject Alabama's election law to strict scrutiny.**

Because none of the Party Plaintiffs qualified for ballot access in 2012, none of their names appeared on the ballot. As a result, the Party Plaintiffs lost "the advantage of building [their] ranks" by associating their name with a popular candidate (Doc. # 98 at 9 (emphasis removed)) and their candidates lost "the advantage of the party label"[5] (Doc. # 98 at 9). Undoubtedly, those losses placed more-than-"trivial" burdens on Plaintiffs' "associational rights." *Timmons*, 520 U.S. at 363. But the question here is whether those burdens rise to the level of "severe."

**1.**    *Supreme Court precedent suggests Alabama's election law does not impose a severe burden on Plaintiffs' constitutional rights.*

The Supreme Court's decision in *Timmons v. Twin Cities Area New Party* is something of a spotted-dog case in this context, so it is a good place to start the analysis. In *Timmons*, a minor party called the New Party wanted to put its name on the ballot next to its presidential candidate of choice, but Minnesota's election law

---

[5] It is unclear whether that advantage is real or imagined. Defendant has an expert who insists party labels on the ballot do not help minor party-candidates at all.

8

would not allow it.[6] The New Party said that the law put an unconstitutional burden on its "right to communicate its choice of nominees on the ballot on terms equal to those offered other parties," *id.* at 362 – basically the same burden Plaintiffs faced here.

The Supreme Court rejected the New Party's challenge and expressed skepticism that political parties have "a right to use the ballot itself to send a particularized message" about their support for a candidate. *Id.* at 363. After all, the Court reasoned, the voting booth is not meant to be a place of voter education; "[b]allots serve primarily to elect candidates, not as forums for political expression." *Id.* at 363; *cf. id.* at 359 ("That a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights."). Thus, to the extent Plaintiffs argue their associational rights were burdened because the Party Plaintiffs and their candidates could not use the ballot as a vehicle to communicate with voters (and that is the only real consequence of leaving the Party Plaintiffs' names off the ballot), *Timmons* settles that the burden they shouldered was not severe.

---

[6] The problem there was that the candidate was already spoken for by another party, and Minnesota's law only allows candidates to list one party on the ballot. That difference does not matter here where the court is only trying to determine the "character and magnitude" of the burden on Plaintiffs' rights.

9

### 2.     *Plaintiffs cite no authority that suggests Alabama's election law severely burdens their constitutional rights.*

Plaintiffs do not address *Timmons*, much less try to explain how this court could distinguish that case and hold that anyone's rights were severely burdened when Alabama's law (allegedly) kept the Party Plaintiffs' names off the 2012 ballot.[7] Instead, Plaintiffs rely heavily on two decisions that struck down early ballot-access deadlines – decisions Plaintiffs say prove Alabama's election law is unconstitutional on its face.[8] But neither of the decisions on which Plaintiffs rest their case can bear the weight.

First, Plaintiffs try to draw an analogy to *Anderson v. Celebrezze*, 460 U.S. 780 (1983). At issue in *Anderson* was an Ohio law that required independent candidates to qualify for ballot access 120 days before the major parties held their primaries. That meant independent candidates had to qualify for ballot access in March of the election year. Independent candidates who did not submit their signatures in time

---

[7] It is worth noting that Plaintiffs have never maintained that Alabama's election law forecloses any other method of voter communication. Among the ways the Party Plaintiffs and Party Candidates could have communicated with voters were commercials, signs, speeches, debates, town-hall meetings, endorsements, canvassing, social networking, websites, newsletters, bumper stickers, handshaking, baby-kissing, robodialing, leafleting, good-old-fashioned stumping, *etc*. If any Alabama law restricted Plaintiffs rights to utilize those time-tested campaigning tools, they are not at issue in this case.

[8] In doing so, Plaintiffs are off to a bad start: The court has already decided neither of those cases establishes the severity of Plaintiffs' burden as a matter of law. (*See* Doc. # 64 at 15–19 (rejecting the same arguments the court is about to reject again).)

could not appear on the ballot at all.  The Court held Ohio's scheme placed unconstitutional burdens on "voters' freedom of choice and freedom of association." *Id.* at 806.

But Alabama's election law is different in two important ways.  First, Alabama's minor parties can wait until the major-party primaries before they submit their ballot access petitions, while the Ohio law in *Anderson* set a ballot-access deadline well before the primaries.  The difference matters, because laws like Alabama's "impose[] no discriminatory burden on . . . minor party candidates," *Swanson v. Worley*, 490 F.3d 894, 908 (11th Cir. 2007), while laws like Ohio's favor the major parties and are "subject to searching scrutiny," *id.*  Second, and more importantly, no one argues that Alabama's law keeps third-party candidates off the ballot, only that it makes it harder for them to communicate their party affiliation to voters.  Thus, Alabama's law does not implicate *Anderson*'s "primary concern," viz., "the tendency of ballot access restrictions to limit the field of candidates from which voters might choose." *Anderson*, 460 U.S. at 786.

Plaintiffs ask the court to ignore these differences and focus on one similarity Alabama's scheme has with the one in *Anderson*: a March deadline.  But to do so, the court would have to ignore the part of *Anderson* that commands it to resolve this case "by an analytical process that parallels its work in ordinary litigation." *Id.* at 789; *see*

11

*id.* ("The results of this evaluation will not be automatic."). In ballot-access cases like this one, "there is no substitute for the hard judgments" this court must make, *id.* at 789–90. Nothing in *Anderson* suggests this court can make those judgments without evidence of the severity of Plaintiffs' burdens. The *Anderson* decision is not (and does not purport to be) a "litmus-paper test" that automatically invalidates March deadlines. *See id.* at 789 ("Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any litmus-paper test that will separate valid from invalid restrictions." (quotations omitted)). And as the court has noted once before, "it would be inappropriate to rely on the factual findings of the balance of burdens that prevailed in Ohio in 1980, when the challenged action in *Anderson* occurred." (*See* Doc. # 64 at 15.)

Similarly, the shaky analogy Plaintiffs draw to *New Alliance Party of Alabama v. Hand* collapses under its own mass. 933 F.2d 1568, 1570 (11th Cir. 1991). In *New Alliance*, the Eleventh Circuit held an April deadline for ballot-access petitions was unconstitutional, noting that "[n]o one can seriously contend that a deadline for filing for a minor party and its candidate seven months prior to the election is required to advance legitimate state interests." *Id.* at 1576. Plaintiffs cite that case as proof that filing deadlines severely burden the constitutional rights of minor parties and their candidates.

12

.

But Plaintiffs ignore the parts of *New Alliance* where Judge Hobbs (whose opinion the Eleventh Circuit adopted as its own) expressly found that the challenged deadline made it only "moderately difficult for a minor party candidate to qualify to be on the ballot" and that "the burden [that deadline] imposed on minor parties [was] not insurmountable." *Id.* at 1575–76. Thus, *New Alliance* does not go far toward helping Plaintiffs establish that Alabama's new March deadline severely burdened their constitutional rights. If anything, that case suggests early filing deadlines impose only moderate, surmountable burdens on Plaintiffs' constitutional rights.

### 3.    *Plaintiffs have not shown a genuine issue of material fact that Alabama's election law severely burdens their constitutional rights.*

Because Plaintiffs cite no authority that resolves this case as a matter of law, the court must decide whether Plaintiffs have shown that Alabama's election law severely burdened their rights as a question of fact. In doing so, the court looks for evidence that could lead a reasonable factfinder to believe a "reasonably diligent" political party could not have submitted its signatures by Alabama's March deadline. *Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983).

In 2012, Alabama's signature requirement meant minor parties had to gather 44,828 signatures to secure a spot on the ballot. Plaintiffs say gathering that many signatures by the March deadline would have been impossible, even for a reasonably

diligent political party.    Unfortunately, there is no direct evidence on that point because none of the Party Plaintiffs made any reasonably diligent efforts (or any efforts at all) to meet Alabama's signature requirement.  Instead, the Party Plaintiffs argue that any efforts to secure ballot-access would have been futile, and they point to three problems that so "discourag[ed] and demoraliz[ed]" (Doc. # 98 at 12) them that they "did not undertake any effort to comply with the March deadline" (Doc. # 81 at 1).

The first problem was cost. According to the Constitution Party of Alabama's chairman, it would have cost at least $100,000 to pay signature gatherers for enough signatures to gain ballot access.  The Alabama Libertarian Party's chairman thought the figure exceeded $200,000.  It is unclear, however, whether those estimates are entitled to any weight because the cost of signature gathering is a proper subject of expert testimony,[9] and Plaintiffs have tendered neither chairman as an expert witness. But the court will assume, for the moment, that none of the Party Plaintiffs could have afforded to pay enough signature gatherers to fill their ballot-access petitions.  If that were the case, then Plaintiffs have submitted some evidence that Alabama's law placed a burden on the Party Plaintiffs' right to ballot access.  But that evidence,

---

[9] *See Green Party of Tenn. v. Hargett*, 882 F. Supp. 2d 959, 1005 (M.D. Tenn. 2012) (relying on expert testimony to place the market price of signature gathering at $1.50 to $2.00 per signature).

14

standing alone, does not raise a genuine issue of material fact that the burden is *severe*. There are other ways to gather signatures than to pay for them; for instance, volunteers.

That leads to Plaintiffs' second problem: low volunteer interest. According to Plaintiffs, it is hard to recruit volunteers in March because the minor parties had not selected their candidates at that time. (*See* Doc. # 98 at 8 (claiming that volunteers "can only be provided in significant numbers by the presidential campaign itself").) But it is still unclear whether that amounts to a severe burden or a minor one because Plaintiffs submit no evidence that gives even a rough idea how many volunteers the Party Plaintiffs could have recruited before March, nor how dramatically that number increased after they selected their candidates. The difference matters; without that type of information, the court cannot tell how severe a burden the March deadline placed on the Party Plaintiffs' ability to recruit volunteers.

Plaintiffs' final problem was low voter interest; Plaintiffs say it is hard to gather signatures in March when voter interest "is at low ebb." (Doc. # 98 at 2.) But there is no evidence of just how low voter interest ebbed in March 2012. By that point there had already been some twenty televised Republican debates[10] and punditry was in full

---

[10] This count comes courtesy of Wikipedia's list of Republican Party Presidential Debates 2012, and is mentioned only to illustrate the sort of fact that would have been helpful in determining the level of voter interest last March, not as evidence of the conditions that actually prevailed at that time. Wikipedia is not a source that warrants judicial notice. *See, e.g., Flores v.*

15

swing. It is safe to assume voter interest was lower in March than it was in, say, June. (Just like it is safe to assume voter interest was lower in June than it was in November.) But that assumption does not help answer the real question here: Was voter interest *so low* in March that minor parties making reasonably diligent efforts could not have gathered enough signatures by then?

Then there is Americans Elect ("AE"). As far as the record shows, AE is the only minor party that tried to secure a spot on the 2012 presidential ballot – and it succeeded. Plaintiffs downplay that achievement by pointing to AE's deep pockets. (It raised over $1.1 million in the third quarter of 2010 alone.) But there is no evidence that AE spent any of that money paying signature gatherers. On this record, the court cannot write AE off as an anomaly; that party's success supports the conclusion that Alabama's election law regime does not pose an insurmountable barrier to the entry of third parties that make diligent efforts. Instead, the evidence shows that one minor party (perhaps the only one that tried) managed to overcome all the purportedly insurmountable obstacles that prevented the Party Plaintiffs from even trying to get a spot on the ballot, including high cost, low interest, and an unknown candidate.[11]  *Cf. Munro v. Socialist Workers Party*, 479 U.S. 189, 196 (1986)

---

*State*, No. 14-06-00813-CR, 2008 WL 4683960, at *2 n.3 (Tex. Crim. App. Oct. 23 2008) (declining an invitation to take judicial notice of information posted on Wikipedia).

[11] AE never did get around to selecting a candidate.

16

(considering evidence that "only 1 out of 12 minor-party candidates has appeared on the ballot" and concluding that it "prove[d] very little" except that the challenged law posed no "insuperable barrier to minor-party ballot access").

And there is no evidence that suggests the Party Plaintiffs could not emulate AE's strategy of getting an early start. AE began submitting signature petitions in September 2011, but the Party Plaintiffs give no reason they could not have done the same. *Cf. Swanson*, 490 F.3d at 898 n.4 (noting that "Alabama provides unlimited time for the petitioning effort," which prompted the Libertarian Party to begin its ballot-access drive "seventeen months before the 2000 election"). If the Party Plaintiffs had started gathering signatures on September 1, they could have met the signature deadline with twenty volunteers gathering an average of twelve signatures a day.[12] *Cf. Storer v. Brown*, 415 U.S. 724, 740 (1974) ("Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President."). And there is no indication they could not have started even earlier than

---

[12] A September 1 deadline would have left 194 days to submit 44,828 signatures, meaning the minor parties could have gained ballot access by gathering 232 signatures a day.

17

that.

Finally, and most importantly, Plaintiffs have failed to offer any evidence that a later deadline would lessen their burden. Even if the minor parties had until election day to submit their petitions, there is no evidence that they could have gathered enough signatures to get on the ballot.[13] The record contains no evidence the parties would have been able to pay signature gatherers with a later deadline, nor is there evidence that voter or volunteer interest would have ever increased enough that the party could have fulfilled its signature requirement. Thus, there is no evidence that Alabama's March deadline severely burdened the Party Plaintiffs' right to ballot access. Instead, it seems Plaintiffs' real problem was the number of signatures Alabama demands.[14]   *Cf. Swanson*, 490 F.3d at 912 (holding that Alabama's

---

[13] For the Constitution Party at least, the problem does not seem to lie so much with Alabama's laws as it does with the party's base: That party's chairman testified that "efforts by volunteers would not contribute significantly to a statewide petitioning drive," (Doc. # 98 at 7); that non-volunteer methods of gathering signatures are "prohibitively expensive" (Doc. # 98 at 8) (which does not mean much for a party whose annual donations have never surpassed $4,000 and whose members "totally rejected" a recent attempt to impose membership fees as a way to raise funds for future ballot access drives (Doc. # 100 at 11)); and that "even if his state party could raise $100,000, it would likely not devote such resources to a statewide ballot effort without knowing who the presidential candidate was going to be" (Doc. # 98 at 8). It is hard to imagine *any* election policy that makes room for a party that is unable to muster any significant volunteer support and unwilling to raise or expend any substantial amount of money to support the party as opposed to a particular candidate. The fact that the Constitution Party has never come close to getting on the ballot, even when the deadline was later in the year, suggests the March deadline is not the part of Alabama's election law that keeps the Constitution Party off the ballot.

[14] The court recognized this problem in an earlier order, noting that Plaintiffs had failed to offer any evidence suggesting their problem was with the March deadline rather than "the

"signature requirement . . . does not impose a severe burden" on minor-party ballot access in statewide elections); *Libertarian Party*, 710 F.2d at 795 (deeming Florida's more burdensome signature requirement was constitutional even in the context of a presidential race).

## C.   Alabama's election law rationally serves important state interests.

These are unusual facts for a ballot-access case. Typically, minor parties challenging a state's scheme go about their business collecting signatures and submitting them, which they can then use to prove they could have complied with less burdensome access requirements. *See, e.g., Anderson*, 460 U.S. at 782 (brought by a candidate who collected enough signatures to qualify for ballot access but could not meet the state's early deadline); *New Alliance*, 933 F.2d at 1571 (brought by a plaintiff who submitted "an adequate number of signatures" but did not meet the deadline). But that did not happen here, and as discussed above, nothing in the record suggests Alabama's March deadline, even in conjunction with the number of signatures Alabama requires, posed any impediment to minor parties that made reasonably diligent efforts to get on the ballot.[15] *See Libertarian Party of Fla.*, 710 F.2d at 794

_____

generic difficulty in gaining access to the ballot." (Doc. # 64 at 19.)

[15] Before moving on, it is important to emphasize that the court's conclusion was compelled by Plaintiffs' failure of proof. When the Eleventh Circuit faced the same problem in *Swanson*, it wrote the following passage: "[T]here is no evidence in the record in this case that any independent or minor party candidate sought and failed to gain access in any Alabama races

(noting plaintiffs who did not attempt to gather signatures "because in their view the 3% requirement simply was impossible to meet" had "failed to present factual evidence that they were precluded from obtaining ballot status").

Because Plaintiffs have not established a "severe" burden on any of their constitutional rights, Alabama need only show that its deadline for ballot-access petitions "rationally serves important state interests." *Swanson*, 490 F.3d at 912. To determine whether it does, the court considers whether Alabama's signature deadline "freeze[s] the status quo by effectively barring all candidates other than those of the major parties." *Libertarian Party*, 790 F.2d at 793. On that standard, Alabama's scheme passes muster.

To start, it is beyond dispute that Alabama has an important interest in requiring minor parties to demonstrate some "modicum of support" before they are entitled to a spot on the ballot. *Swanson*, 490 F.3d at 902. And the Eleventh Circuit has already held that Alabama's 3% signature requirement is a rational way to serve that interest. *Id.* at 912. Thus, it is settled law that Alabama can demand 45,000 signatures on a

---

since . . . 2002. All we say here is that the evidence in this particular record does not establish any severe burden on rights." *Swanson*, 490 F.3d at 910. Thus the court cannot affirmatively conclude that Alabama's election law imposes minor burdens on Plaintiffs' rights; it finds only that Plaintiffs (who would bear the burden of proof at trial) have failed to prove otherwise.

petition before it lets a minor party on the ballot.[16]

But the question here is whether it can demand them in March. Alabama says it can, and that doing so is a rational way to promote two important interests: (1) Alabama's interest in treating minor political parties "in a manner that is fair and appropriate relative to" the major ones (Doc. # 96 at 23), and (2) its interest in a deadline that leaves enough time to verify petition signatures.[17]

On the first point, Alabama argues that it has an interest in providing a fair playing field for political parties, and Plaintiffs do not deny the importance of that state interest. (In fact, they do not address it at all.) And in light of *Swanson's* approval of a ballot-access deadline tied to the primaries as a "nondiscriminatory restriction," 490 F.3d at 908, that "does not place independent and minor party candidates at a relative disadvantage to major party candidates," *id.* at 909, the court has no trouble concluding that Alabama's minor-party ballot-access deadline rationally serves that interest. Indeed, *Swanson* suggests that allowing the minor parties to submit their access petitions at a date later than the primaries would give

---

[16] *Swanson*, 490 F.3d at 912. ("Alabama's election scheme, with a three-percent signature requirement and filing deadline on the primary election date, does not abridge plaintiffs' First and Fourteenth Amendment rights.").

[17] Alabama does not present much evidence in support of these interests, but it does not have to. *See Swanson*, 490 F.3d at 912 (noting that states defending ballot-access requirements are "not required to present evidence in support of [their] professed interests").

21

them an advantage relative to the major parties. *Id.* at 908 (noting that "the Constitution . . . does not mandate that states give independent and minor party candidates preferential treatment over major party candidates").

On the second point, Alabama argues that its filing deadline ensures the state has enough time to verify the signatures on ballot-access petitions. (Doc. # 96 at 23.) Plaintiffs concede that point, agreeing that Alabama "undeniably" has a legitimate interest in a deadline that is early enough to verify petition signatures. (Doc. # 98 at 14.)

But Plaintiffs balk at the notion that the March deadline is necessary to advance that interest, quoting *New Alliance* for support: "No one can seriously contend that a deadline for filing for a minor party and its candidates seven months prior to the election is required to advance legitimate state interests." *New Alliance*, 933 F.2d at 1576. But Plaintiffs miss the point. Of course that quote from *New Alliance* is true; filing deadlines are arbitrary by nature, so any filing deadline before the election day is more or less "impossible to defend as either compelled or least drastic." *Libertarian Party of Fla.* 710 F.2d at 793.[18]  That is precisely why the law does not require

---

[18] No matter what deadline Alabama sets, one might argue that a deadline a few days, or hours, or minutes later would serve its interests just as well. *Cf. Libertarian Party of Fla.*, 710 F.2d at 793 (noting the same argument works with challenges to signature requirements because "[a]t any point, probably a fraction of a percentage point less . . . would not leave the interests of the state unprotected"). The problem is, the logic of that argument holds up until the ballots are printed. One can use the same logic to argue a single grain of sand amounts to a heap or that a

Alabama to make such a showing; it suffices here that Alabama's filing deadline rationally serves its administrative interests by ensuring there is time before the election to verify petition signatures.

And it does. As Alabama points out, last year's March deadline allowed the State to "reserve a window of time from early June until sometime in September (when the ballots must be printed) for checking the petitions of independent candidates." (Doc. # 100 at 18.) Alabama wants to ensure that it has time to verify the signatures on ballot-access petitions, and one rational way to do that is to reserve a different block of time for each group – March to June for minor parties, June to September for independents.

Thus, the Alabama Secretary of State has shown that Alabama's deadline for minor parties to submit their ballot access petitions rationally serves two important state interests. And because Plaintiffs have failed to raise a genuine issue of material fact that Alabama's election law "completely insulate[s] the two-party system from minor parties' . . . competition and influence," *Timmons*, 520 U.S. at 367, the court finds that there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

---

million straws of hay stacked one atop the other do not form a haystack. *See* Dominic Hyde, *Sorites Paradox*, Stanford Encyclopedia of Philosophy (July 16, 2013, 4:50 p.m.), plato.stanford.edu/entries/sorites-paradox/#1.

## V.  CONCLUSION

Accordingly, it is ORDERED as follows:

(1)    Plaintiffs' motion for summary judgment is DENIED;

(2)    Defendant's motion for summary judgment is GRANTED.

An appropriate judgment will follow.

DONE this 5th day of September, 2013.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE

24